# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **THOMAS McCURDY,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:16CV00017 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **VIRGINIA DEPARTMENT OF** | ) | By: James P. Jones |
| **CORRECTIONS,** | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

*Joshua Erlich, Davia Craumer, and Katherine L. Herrmann, The Erlich Law Office, PLLC, Arlington, Virginia, for Plaintiff; Ryan Spreague Hardy, Assistant Attorney General, and Sydney E. Rab, Senior Assistant Attorney General, Richmond, Virginia, for Defendant.*

The plaintiff, a former state correctional officer, asserts claims of race-based employment discrimination, harassment, and retaliation under Title VII of the Civil Rights Act of 1964. The plaintiff has moved for partial summary judgment on his hostile environment harassment and race-based discrimination claims, and the defendant state agency has moved for summary judgment on all claims. Because the undisputed facts show that the defendant is entitled to judgment as a matter of law, I will grant summary judgment in favor of the defendant and deny the plaintiff's request for partial summary judgment.

I.

The following facts are taken from the summary judgment record and, except where otherwise noted, are undisputed.[1]

From April 2012 until May 16, 2014, Plaintiff Thomas McCurdy was employed as a correctional officer at Red Onion State Prison ("Red Onion"), a maximum-security prison located in Pound, Virginia, and operated by defendant Virginia Department of Corrections ("VDOC"). McCurdy is African-American.

On August 26, 2011, correctional officer Marie Knoskie, who is African-American, found a swastika scratched into a control board at Red Onion.[2] She reported what she found to Human Resources Director Renee Conley. Knoskie was assigned to a new post until the swastika could be removed. Sergeant Tony Adams attempted to determine who had carved the swastika, but because so many officers had been assigned to the control room, he could not establish a list of suspects. Adams interviewed correctional officers who had worked the post, but all of the officers denied etching the swastika. Then-Warden Tracy Ray informed Knoskie that VDOC had investigated the incident and could not identify the

---

[1] The plaintiff has lodged numerous objections to various items of evidence filed in support of the defendant's Motion for Summary Judgment. I have considered all of the plaintiff's objections, and in deciding the present motions, I rely only upon evidence that I find would be admissible in a trial of this case.

[2] Although it was initially identified as a swastika, there is some suggestion in the evidence that the symbol may have been flaming wings, a symbol used by the Ku Klux Klan.

culprit. Knoskie mentioned to Conley that similar incidents had occurred twice before, but she provided no details.

On January 9, 2012, Knoskie met with Conley and Major Travis McCoy to complain of race discrimination after a position in which she had expressed an interest was assigned to a white officer. Later that day, Knoskie met with Warden Randall Mathena, Conley, and Assistant Warden Kiser to voice her complaint. She stated that she felt she was being denied the training required to further her career. She claimed that McCoy had accused her of calling him a bigot after she had told him she felt she was experiencing discrimination. McCoy stated that the white officer had already received the necessary training for the post, and the post needed to be filled quickly.

On April 1, 2013, Knoskie found the words "I Hate Niggers" written in a logbook in the C2 Control Room at Red Onion. Knoskie showed the logbook to McCurdy, and the two of them gave the book to counselor Norman Lewis. McCurdy also told his supervisor, Lieutenant Paul Payne, about the phrase written in the logbook. McCurdy states that he frequently asked Payne what steps were being taken to investigate the incident. Knoskie told McCurdy that she had not heard anything more about the logbook.

In February 2014, Knoskie was assigned to the C2 Control Room and refused to take the post because it was the location where she had discovered the

racial epithet in the logbook. Conley did not learn of the logbook incident until Knoskie refused to take her assigned post, approximately ten months after Knoskie first discovered and complained about the message in the logbook.

After Warden Mathena learned of the phrase written in the logbook, he asked Lieutenant John McQueen to investigate the incident. McQueen did not know when the racial slur was written in the logbook, and he was unable to identify the author of the slur based on a layperson's comparison of handwriting samples. He determined that a forensic examination of handwriting samples would be prohibitively expensive given the large number of officers who had access to the C2 Control Room. At the time of the investigation, VDOC did not undertake a formal analysis of the cost of a forensic handwriting examination.

VDOC did not add surveillance cameras to the C2 Control Room, institute any policy changes as a result of the logbook incident, or take any other action in response to the slur written in the logbook besides removing the book from the C2 Control Room. There was a camera installed in the control room at the time the racial slur was written, but it was positioned at an angle that did not capture the person who wrote the slur. In May 2014, McCurdy asked Major Arvil Gallihar about the logbook. Gallihar informed him that the Red Onion administration had investigated the logbook incident but was not able to determine who had written the slur, and there was nothing more that could be done.

On September 23, 2013, Lieutenant Steven Franklin witnessed correctional officer Daniel Sexton use the word "nigger" to describe a football player. Knoskie was standing nearby, and Sexton immediately apologized to her and offered to accompany her to Human Resources to file a complaint. Knoskie accepted Sexton's apology and opted not to make a complaint about the incident. Franklin verbally counseled Sexton, and a written notice of counseling was signed by Sexton and placed in his file. Franklin reported the incident to Unit Manager Greg Swiney on the day that it occurred. Swiney did not report the incident to Human Resources. Knoskie eventually told Conley about the incident on March 3, 2014. Conley then questioned Swiney, who indicated that Franklin had correctly handled the matter by verbally counseling Sexton.

McCurdy's nephew, correctional officer Martinez Miles, also worked at Red Onion. While Miles was on short term disability leave, Conley asked McCurdy about Miles. McCurdy told Conley that Miles did not want to return to work because of racial slurs and jokes that had been directed at Miles by fellow officers. Conley told McCurdy that Miles needed to report these incidents, but McCurdy responded that Miles was hesitant to file a complaint because he feared retaliation. Conley called Miles but did not reach him and was unable to leave a message. Miles never lodged a complaint, although McCurdy testified in his deposition that he and Miles had previously spoken to Conley about the jokes before Miles began

his disability leave.  Conley did not conduct any further investigation.  McCurdy did not follow up with her or reduce his concerns to writing.

There are numerous disputed allegations regarding McCurdy's hostile environment harassment claim.  McCurdy alleges that several Red Onion employees made racist jokes and used racial slurs in McCurdy's presence.  He alleges that he received a written threat from an inmate and that he informed Lieutenant Joe Fannin about the incident.  McCurdy asserts that Lieutenant James Lambert used a racial slur in front of Greg Swiney, Lambert's supervisor, and was not disciplined.  McCurdy alleges that Mathena used a racial epithet to describe an inmate during a prison fight.  All of these allegations are denied by the alleged speakers and involved parties.  McCurdy concedes that he did not inform anyone about several of the racial slurs and jokes he now alleges.

Operating Procedure 145.3: Equal Employment Opportunity ("EEO Policy") details VDOC's procedure applicable to complaints of harassment and discrimination.  The EEO Policy directs employees to report harassment or discrimination through an established complaint protocol.  The EEO policy states that complaints should be made in writing, though in a Rule 30(b)(6) deposition, Conley testified that complaints can be made orally to her.  Red Onion provided annual training to employees regarding the EEO Policy.  McCurdy did not submit any written complaints of harassment or discrimination.

McCurdy asserts that he verbally complained to counselor Emily Sowards about racist slurs and jokes, but he admits he did not identify specific officers or incidents. Sowards does not recall McCurdy ever making such a complaint.

McCurdy asserts that he complained to Conley about racist jokes on three occasions. He alleges that he identified specific officers in his first conversation with Conley, though Conley does not recall the conversation. On a second occasion, McCurdy alleges that he complained to Conley that Lambert had referred to an inmate using a racial slur, but Conley does not recall that complaint. McCurdy and Conley both recall the alleged third conversation, when they spoke about Miles. McCurdy did not give Conley specific examples of jokes directed at Miles, nor did he identify the people who allegedly told the jokes. McCurdy alleges that he also complained to Major Arvil Gallihar about the prevalence of racial jokes and slurs at Red Onion, but Gallihar does not recall this conversation.

McCurdy asserts that Officer Barry Mullins made a number of race-based jokes and statements in McCurdy's presence, some of which were specifically directed at McCurdy. McCurdy also asserts that Lambert referred to an inmate as a "nigger." In addition, McCurdy states that Fannin asked him about his wife's race. Lambert and Fannin deny making these statements. McCurdy states that he told Fannin that an inmate threatened him, and Fannin failed to take any action in

response to the threat. Fannin denies he ever received notice that an inmate threatened McCurdy.

McCurdy further asserts that Mathena once referred to an inmate as a "spear chucker," which Mathena denies. McCurdy also contends that Sergeant Mark Mullins once said "What's up my niggas?" to McCurdy and Miles.

On May 16, 2014, McCurdy arrived at Red Onion for his work shift and submitted to a security search, as he was required to do. He then went to the restroom, which was outside of the search area. When he exited the restroom, he entered the prison without being searched again. Correctional officer Reba Murphy informed McQueen that McCurdy had entered the prison without going through the security checkpoint. McQueen reviewed camera footage that confirmed that McCurdy had exited the restroom and proceeded into the prison without going through the security checkpoint. McQueen reported this information to Mathena.

Mathena summoned McCurdy to his office. Conley was not present for this meeting, and there are no contemporaneous notes from the meeting. McQueen and Gallihar were present. Mathena showed McCurdy the camera footage and asked whether McCurdy had anything in his pocket. McCurdy removed a cigarette lighter from his pocket and placed it on the table. Possession of a lighter inside the prison violated Operating Procedure 320.6: Tobacco Products and Smoking

("Tobacco Policy"). Violations of the Tobacco Policy were to be addressed in accordance with Operating Procedure 135.1: Standards of Conduct ("Standards of Conduct Policy"). Mathena had previously told employees that he would not tolerate them bringing contraband into Red Onion.

The remainder of Mathena's interaction with McCurdy is in dispute. Mathena asserts that he asked McCurdy whether he had intended to give the lighter to an inmate and whether other correctional officers were bringing contraband into the prison. Instead of answering the questions, McCurdy asked if he could resign. Mathena declared that he usually gives officers the option to resign before instituting an investigation if he believes they are likely to be terminated.

McCurdy, on the other hand, asserts that he brought the lighter into the prison accidentally and that Mathena did not ask him any questions. According to McCurdy, Mathena told him he could either resign or be fired, and if he chose not to resign, Mathena would "drag [McCurdy's] name through the mud." Br. in Supp. of Def.'s Mot. for Summ. J. Ex. 29 at 53, ECF No. 30-29. Mathena stated in a declaration that if McCurdy had brought the lighter into Red Onion accidentally, his conduct would have warranted discipline, but not termination.

Gallihar escorted McCurdy to the Human Resources office, where he tendered his resignation to Conley. On the way to the Human Resources office, McCurdy asked Gallihar what he was going to do about the slur in the logbook and

stated that he was only being flagged for bypassing security because he was black. Gallihar responded that the logbook was unrelated to his misconduct. Conley was surprised when McCurdy resigned because he had been a good employee with no disciplinary history. McCurdy told Conley he had resigned in lieu of termination. McQueen later told Conley that McCurdy had voluntarily resigned and was not facing termination. A document in McCurdy's personnel file dated May 30, 2014, states that McCurdy is ineligible for rehire.

The day before McCurdy resigned, another correctional officer, Christopher Rose, had resigned. McQueen had been investigating Rose, who was suspected of bringing tobacco into the prison to give to inmates. Rose was suspected of having an accomplice who had assisted in bringing tobacco-related contraband into Red Onion. Rose and McCurdy worked in the same building. Rose is white. McQueen was never able to identify Rose's alleged accomplice. It is unclear whether Mathena suspected that Rose had a "running mate" at the time of his meeting with McCurdy.

Following his termination, McCurdy filed a Charge of Discrimination with the Virginia Division of Human Rights, contending that he had been the victim of discrimination based on race and retaliation. In the charge, he stated, "I believe I was retaliated against for a request I made two months prior for racial slurs and jokes to stop." Br. in Supp. of Def.'s Mot. for Summ. J. Ex. 20, ECF No. 30-20.

The charge does not expressly allege hostile environment harassment, and McCurdy did not check the box on the form to indicate a continuing violation. Rather, he listed May 16, 2014, as both the earliest and the latest date on which discrimination took place.

VDOC submitted evidence of a number of non-black former employees who, in its view, were similarly situated to McCurdy and received equal discipline.[3] On March 16, 2013, a white correctional officer named Joshua Jessee admitted that he had given tobacco and other items to inmates and that he had brought tobacco into Red Onion for personal use. Conley was present during a pre-disciplinary meeting between Jessee and Mathena. Mathena told Jessee that he could resign rather than be disciplined. Alternatively, if an investigation resulted in discipline, he could use the state grievance procedure to contest any disciplinary decision. Mathena told Jessee that if he chose to resign, Mathena would hold his resignation for twenty-four hours to allow time for Jessee to change his mind. Mathena gave Jessee three days to make a decision. Jessee was suspended and placed on pre-disciplinary leave pending completion of an investigation. He opted to resign on March 20, 2013.

On March 8, 2013, and again on March 13, 2013, white officer Timothy Pleasant met with Mathena and Conley to discuss whether he had passed items

---

[3] I discuss the most relevant comparators here. I have omitted discussion of some proposed comparators whose circumstances were markedly different from the plaintiff's.

between inmates and brought contraband into Red Onion. Mathena did not indicate that T. Pleasant could be terminated or offer him the option of resigning in lieu of termination. T. Pleasant admitted that he had passed items between inmates, but denied bringing contraband into the facility to give to inmates or for his own use. T. Pleasant was disciplined with a three-day suspension for passing items between inmates. Mathena did not terminate him because he had stopped committing the misconduct, was truthful, and turned over notes he had obtained from inmates.

On March 20, 2013, Jonathan Thompson, a white officer, resigned after admitting to bringing tobacco into Red Onion for personal use and passing items between inmates. Conley was present at a meeting between Thompson and Mathena at which Mathena told Thompson that he would most likely be terminated but could resign in lieu of disciplinary action. Mathena allowed Thompson three days to decide whether to resign. Before he resigned, Thompson was suspended and given pre-disciplinary leave with pay.

On March 22, 2013, white officer Joshua Meade was issued a written notice and terminated for passing items between inmates and bringing tobacco into Red Onion for his own use. On Meade's written notice, Mathena wrote:

> Your tenure, good attendance and truth-telling were considered; however, compromising the security of yourself as well as other staff members by passing is too serious an offense to warrant keeping your position as a corrections officer. Also, you created a credibility issue

between yourself and Management a[t] Red Onion when you "purposefully hid" items on your person when coming through front search.

Suppl. Br. Supp. Def.'s Mot. Summ. J. Ex. 53 at 1, ECF No. 47-4.   The notice informed Meade that he could pursue a grievance regarding his termination. Before the investigation into Meade's conduct, Conley had been present at a pre-disciplinary meeting.   Meade had been suspended on March 14, 2013, and was placed on pre-disciplinary leave with pay until he was terminated eight days later.

Also on March 22, 2013, correctional officer Jonathan Pleasant, who was white, was issued a written notice and terminated for passing items between inmates and bringing tobacco into Red Onion for his own use.   J. Pleasant was found to have purposely hid the items on his person to avoid detection when passing through security.   At a pre-disciplinary meeting at which Conley was present, Mathena told J. Pleasant that he might be facing termination, but that he had the option to resign.   Mathena gave J. Pleasant three days to decide, and he chose not to resign.   J. Pleasant's written notice contained a paragraph identical to the one included in Meade's written notice and informed him of his right to grieve his termination.

On September 26, 2014, Mathena issued a disciplinary notice to Lincoln Bentley, a white officer, for possessing tobacco inside Red Onion.   He was then terminated.   Bentley had been suspended on August 12, 2014, a month and a half

earlier, and had been placed on paid pre-disciplinary leave, based on allegations that he had brought heroin into Red Onion. Conley was present at a pre-disciplinary meeting on August 28, 2014, as well as two additional meetings between Mathena and Bentley on September 19, 2014, and September 26, 2014. In the last meeting, Bentley admitted to bringing tobacco into Red Onion for personal use. Bentley had previously been issued a written notice for unrelated conduct. Bentley filed a grievance regarding his termination for bringing tobacco into the facility, and the hearing officer upheld the termination, though he noted that Mathena had discretion to issue less harsh disciplinary measures for the offense.

The plaintiff argues that non-black employees were treated more favorably than him because they were given a pre-investigation meeting at which Conley was present, and they were not forced to choose immediately between termination and resignation. Some also received paid leave pending resolution of an investigation.

The Standards of Conduct Policy states,

> Prior to any pre-disciplinary or disciplinary actions, employees must be given oral or written notification of an offense, an explanation of the agency's evidence in support of the charge, and a reasonable opportunity to respond. DOC must provide a clear and descriptive explanation of the offense in a manner that ensures that the employee understands the facts presented and will be able to present mitigating factors or denial of the charge.

Pl.'s Am. Mem. in Supp. of Mot. for Partial Summ. J. Ex. AC at 2, ECF No. 49-29.

A "Reasonable Opportunity to Respond" is defined as "[a] time period allowed for an employee to respond after receiving notification of pre-disciplinary or disciplinary action," and "normally, for discipline which may involve suspension or termination, a twenty-four hour period is sufficient." *Id.* However, "a reasonable opportunity to respond should not be based solely on the quantity of time provided but also on the nature of the offense, which may or may not require time to refute or mitigate the charge." *Id.* Mathena did not tell McCurdy that he would be given time to reconsider his decision to resign.

The Standards of Conduct Policy also provides,

> 5. Employees who resign while disciplinary action is pending or while an investigation is being conducted should be notified in writing at the point of separation that they will be ineligible for rehire.
>
> > a. This notification would normally be done in the letter accepting resignation.
> >
> > b. The personnel record (both the folder and the Personnel Management Information System), will reflect that the employee resigned while disciplinary action was pending. . . .

*Id.* at 6. McCurdy did not receive a written notice that he was ineligible for rehire. Employees who resign voluntarily are normally given an exit interview, but McCurdy did not receive such an interview.

Conley testified in a Rule 30(b)(6) deposition that VDOC did not have the opportunity to consider McCurdy's employment history and other mitigating

factors because he resigned before the investigative or disciplinary process began. She testified that Mathena almost always offered employees the opportunity to resign immediately, before an investigation or any disciplinary proceeding commenced. In McCurdy's case, had he not resigned, VDOC would have begun the disciplinary process described in the Standards of Conduct Policy.

Following discovery, both parties moved for summary judgment. The motions have been fully briefed and are ripe for decision.[4]

## II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

---

[4] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis. *Id.* at 327. It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

### A. Defendant's Motion for Summary Judgment.

#### 1. Hostile Environment Harassment Claim.

The defendant argues that McCurdy's hostile environment harassment claim is barred because he failed to exhaust his administrative remedies as to this claim. I agree and will grant the defendant's motion as to the hostile environment claim.

As a prerequisite to a lawsuit, Title VII requires the filing of a timely administrative charge with the Equal Employment Opportunity Commission ("EEOC"). 42 U.S.C. § 2000e-5. "In any subsequent lawsuit alleging unlawful employment practices under Title VII, a federal court may only consider those allegations included in the EEOC charge." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013). "If a plaintiff's claims in [his] judicial

complaint are reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in [his] subsequent civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). But a federal court may not consider bases of discrimination that the plaintiff has not asserted in his EEOC charge. *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009); *see also Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (holding that where "the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred").

Importantly, the Fourth Circuit has stated that when determining whether a particular claim was encompassed by the plaintiff's EEOC charge, the court should look only to the charge itself and may not consider allegations contained in the EEOC intake questionnaire or other documents the plaintiff filed with the EEOC. *Balas*, 711 F.3d at 408. A plaintiff has failed to exhaust his administrative remedies where "his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005). "A claim will . . . typically be barred if the administrative charge alleges one type of discrimination — such as discriminatory failure to promote — and the claim encompasses another type — such as discrimination in pay and benefits." *Id.* at 509. In addition, "the

allegation of a discrete act or acts in an administrative charge is insufficient when the plaintiff subsequently alleges a broader pattern of misconduct." *Id.* In *Chacko*, the Fourth Circuit held that the plaintiff had failed to exhaust his claim of national origin harassment by coworkers over a span of two decades where his EEOC charges referenced only specific episodes of alleged harassment by supervisors that did not involve national origin epithets. *Id.* at 511-12.

In this case, when McCurdy completed his charge form, he listed the earliest date of discrimination as May 16, 2014, the date on which he resigned. The form contained a box for "continuing action," but he did not check that box. Though he referenced racist slurs and jokes in the narrative portion of the form, he did so in the context of claiming that he had been the victim of retaliation for complaining about the jokes.

I conclude that McCurdy's EEOC charge only asserted claims based on his termination and did not express any claim regarding the hostile environment that he alleges existed throughout his employment at Red Onion. McCurdy's hostile environment claim would not have been expected to follow from a reasonable administrative investigation of the circumstances surrounding his resignation. The key actor in McCurdy's discharge-related claims is Warden Mathena, the only person who had the authority to terminate McCurdy, whereas the evidence relating to the hostile environment claim consists almost entirely of alleged statements

made by McCurdy's coworkers and lower level supervisors. The hostile environment claim involves different actors, a different kind of discrimination, and a different time period than the claims asserted in the EEOC charge. Because McCurdy failed to exhaust his administrative remedies as to his hostile environment claim, I will enter summary judgment in favor of the defendant on that claim.

### 2. Race-Based Discriminatory Treatment Claim.

Title VII prohibits an employer from discriminating against an employee based on the employee's race. *See* 42 U.S.C. § 2000e–2(a)(1). Because the plaintiff here does not claim to have direct evidence of discriminatory intent, his claims under Title VII are subject to the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas,* the plaintiff has the initial burden of establishing a prima facie case of employment discrimination, including that: (1) he is a member of a protected class; (2) he was qualified for his position and his performance was satisfactory; (3) he suffered an adverse employment action; and (4) he was replaced by an individual outside of the protected class. *Id.* at 802. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to respond with evidence that it had a legitimate, non-discriminatory reason for its action. *Love-Lane v. Martin,* 355 F.3d 766, 786 (4th Cir. 2004). If the defendant

is able to make this showing, the burden shifts back to the plaintiff to present evidence that the defendant's articulated reason was pretext for unlawful discrimination. *Id.* "Although the evidentiary burdens shift back and forth under the *McDonnell Douglas* framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

It is undisputed that McCurdy was a member of a protected class, that he was qualified for his position, and that, at least until the date of his termination, his performance was satisfactory. The parties dispute whether he suffered an adverse employment action. VDOC contends that McCurdy resigned voluntarily, while McCurdy asserts that he resigned only because Mathena told him he would be terminated. I find that McCurdy has put forth sufficient evidence to create a genuine dispute as to whether he suffered an adverse employment action.[5]

The fourth element of the prima facie case is more problematic for McCurdy. Neither party has offered any evidence regarding the individual who

---

[5] McCurdy advances a theory that he was constructively discharged. He appears to contend that he resigned because his work environment was objectively intolerable, presumably based on the evidence offered in support of his hostile environment claim. However, this new theory directly contradicts McCurdy's own statements in the EEOC charge and in his deposition, where he clearly stated that he resigned in lieu of termination. I find that there is no evidence in the record to support the plaintiff's constructive discharge theory.

replaced McCurdy.  Instead, both parties have addressed the alternative standard adopted by the Fourth Circuit that a plaintiff in a discriminatory termination case only needs to show that similarly situated employees outside the protected class were treated more favorably.  *See Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

With the exception of one person, the white correctional officers identified as comparators all lost their jobs, just like McCurdy.  Every identified individual who violated the Tobacco Policy was either terminated or resigned in lieu of termination.  The plaintiff argues that he was treated less favorably than similarly-situated white officers because he

> was not provided the due process provided to white comparator officers while disciplinary action was pending, including the presence of a Human Resources Officer at pre-disciplinary meetings, pre-disciplinary suspension with pay to allow for disciplinary review, and a reasonable opportunity to respond to the allegations against him and to describe the mitigating circumstances applicable to his situation.

Pl.'s Am. Mem. in Supp. of Mot. for Partial Summ. J. 31, ECF No. 49.  This argument is meritless.  First, the plaintiff has asserted a claim that he was terminated because of his race; he has not asserted a claim that his due process rights were violated.  Second, the evidence clearly establishes that McCurdy resigned before he could be afforded the due process protections of which he complains.  Regardless of what Mathena may have said to him, McCurdy had an unequivocal right under both VDOC policy and state law to proceed through the

disciplinary process and to grieve any termination. *See* Va. Code Ann. §§ 2.2-3000 – 3001; 2.2-3003 – 3004. It is undisputed that McCurdy was aware of the applicable due process, disciplinary, and grievance policies, but he opted not to pursue them. He cannot now complain that he was afforded less due process than other employees. Viewing the evidence in the light most favorable to the plaintiff, McCurdy cannot establish that similarly situated employees outside his protected class were treated more favorably than him.

Even if he could establish a prima facie case of discriminatory discharge, McCurdy has failed to rebut the defendant's legitimate, nondiscriminatory reason for his alleged termination. An employer is entitled to summary judgment on a Title VII claim "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff [has] created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). As the Supreme Court has counseled, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the

employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148-49.

VDOC disputes that McCurdy was terminated, but it argues that even if Mathena had decided to terminate McCurdy, he had a valid reason for doing so. It is undisputed that McCurdy violated VDOC policy when he left the restroom and entered Red Onion without being searched. It is further undisputed that McCurdy violated the Tobacco Policy when he brought a lighter into Red Onion, regardless of whether he did so intentionally or accidentally. Mathena certainly had reason to suspect that McCurdy had intentionally brought the lighter into the prison, as no lighter was found in his pocket when he was searched prior to entering the restroom. This fact implies that McCurdy retrieved the lighter from the restroom and then bypassed security to avoid detection of the lighter. Like McCurdy, other non-black correctional officers who violated the Tobacco Policy were given the option to resign in lieu of termination, and many did. Those who did not were ultimately terminated.

The only evidence McCurdy offers to show that racial animus was the real reason for his alleged termination is his own testimony that he once heard Mathena use a racial slur when referring to an inmate. The alleged slur was not directed at McCurdy, was not uttered around the time of his termination, and bears no relationship to the May 16, 2014, meeting between McCurdy and Mathena. As of

the date he resigned, McCurdy had worked at Red Onion for more than two years and had received positive evaluations. Viewed in the light most favorable to McCurdy, the record evidence simply does not give rise to an inference that VDOC's stated reasons for his termination were pretext and that the real reason for his termination was racial animus. Because McCurdy cannot meet his ultimate burden of persuasion, I will grant the defendant's Motion for Summary Judgment as to McCurdy's race discrimination claim.

### 3. Retaliation Claim.

To succeed on a claim of retaliation under Title VII, a plaintiff must prove three elements: "1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action." *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997) (citation omitted). Protected activity includes complaints about race-based harassment that the employee reasonably believes is creating a hostile work environment. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015). Regarding the third element, "[a] plaintiff's own self-serving opinions, absent anything more, are insufficient" to prove that an adverse employment action was linked to protected activity. *Mackey v. Shalala*, 360 F.3d 463, 469–70 (4th Cir. 2004). To establish causality, the protected activity "must have actually played a role in the employer's

decisionmaking process and had a determinative influence on the outcome." *Reeves*, 530 U.S. at 141 (internal quotation marks, citation and alterations omitted). "It is the perception of the decision maker which is relevant to the question of retaliation. . . ." *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 444 (4th Cir. 1998), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002).

VDOC argues that McCurdy has not presented evidence sufficient to demonstrate a causal connection between his purported protected activity and Mathena's decision to terminate him. I agree. McCurdy's sole evidence of causation is that he was threatened with termination approximately two months after he complained about the logbook. This temporal proximity is insufficient, on its own, to show a causal connection between his protected activity and his alleged termination. Importantly, there is no record evidence that Mathena knew about McCurdy's complaint regarding the logbook or any of the other complaints he alleges he made to Conley and others. McCurdy's complaints were not to Mathena but to other individuals, and Mathena has stated that he was unaware of McCurdy's complaints. McCurdy simply has not created a genuine issue of material fact as to whether he was forced to resign because of his protected activity. Therefore, I will enter summary judgment in favor of the defendants on his retaliation claim.

B.  Plaintiff's Motions for Partial Summary Judgment.

Given my disposition of the defendant's motion, for the reasons stated above, I will deny the plaintiff's Motion for Partial Summary Judgment and Amended Motion for Partial Summary Judgment.  I find that the undisputed facts do not warrant judgment as a matter of law in favor of the plaintiff.

IV.

For the foregoing reasons, it is **ORDERED** as follows:

1.     The defendant's Motion for Summary Judgment, ECF No. 27, is GRANTED; and

2.     The plaintiff's Motion for Partial Summary Judgment, ECF No. 28, and Amended Motion for Partial Summary Judgment, ECF No. 48, are DENIED.

A separate final judgment will be entered herewith.

ENTER:  September 5, 2017

/s/  James P. Jones
United States District Judge